## HARRIS v. THE STATE.

1. MURDER: *First and second degree: Provocation: Instruction.*
    An instruction that "if the jury believe that the defendant, at the time he fired the pistol intended to kill the deceased, and did kill him, without any provocation, they will find him guilty of murder in the first degree," is not applicable to a case where there was provocation, and should not be given.

2. SAME: *Doubt as to degree to be resolved for defendant.*
    A doubt as to the degree of murder, upon the facts of the case, should be resolved in favor of the accused.

APPEAL from *Jefferson* Circuit Court.
Hon. X. J. PINDALL, Circuit Judge.

*Martin & Taylor,* for appellant:
The panel should have been quashed, when it was found that one of the jurors was disqualified. Defendant could not know the jurors from the list furnished him. 66 *Mo.,* 684; 54 *ib.,* 153.

The record at the time of the trial showed that two of the jurors on the regular panel had been excused, and the record was not corrected to show the contrary until after conviction. This was error. 16 *Ark.*, 611. The verdict should have been set aside. *Gantt's Digest, secs.* 1893 *and* 3698.

To constitute murder in the first degree, there should be previous intent to kill, and the act of killing must be willful, deliberate, malicious and premeditated. 25 *Ark.*, 411; 29 *Ark.*, 265, *and* 11 *ib.*, 455; 6 *Randolph* (*Va.*), 721. The instruction given to the jury is misleading as to this. See, also, 40 *Ala.*, 350; 9 *Reporter*, 237.

The instruction given for the state excludes the idea of appearance of danger, in mind of a reasonable man, which is sufficient to constitute self-defense. 30 *Iowa*, 331, and cases cited; 8 *Bush* (*Ky.*), 481; 8 *Mich.*, 150.

He who makes first assault may take life, if pressed, after he has, in good faith, abandoned the conflict, and it becomes necessary to defend himself. 2 *Bish. Cr. Law*, sec. 566; *Staffer v. The State*, 15 *Ohio, Stat.*, 47. Words alone will not prejudice one's right of self-defense. 1 *Ohio St.*, 66.

Reasonable apprehension and appearance of imminent danger will justify killing. *Harrigan & Thompson on Self-defense*, 245 *and n.;* 14 *B. Mon.*, 622; 18 *ib.*, 49; 25 *Mich.*, 405; 18 *ib.*, 314; 47 *Mo.*, 604; 8 *Mich.*, 150; *Ros. Crim. Ev.*, 639.

Use of a deadly weapon will not make the case murder, unless it was prepared and intended for use in the conflict. 8 *Smith* (*Pa.*), 1.

To kill in mutual combat only manslaughter. *Thacher's Crim. Cases*, 471.

If deceased used violence in the first place to eject defendant, and was slain, it is not murder without previous malice.

ENGLISH, C. J. At the May term, 1880, of the circuit court of Jefferson county, Jacob Harris was indicted for murder in the first degree; the indictment charging, in the usual form, that he murdered one Ah Yan, by shooting him with a pistol.

He was tried on plea of not guilty. The jury found him guilty of murder in the first degree. A motion for a new trial was made and overruled, bill of exceptions taken, and he was sentenced, twenty-ninth of June, 1880, to be executed on the sixth of August following, and prayed an appeal, which was allowed by one of the judges of this court.

Ah Yan, a Chinaman, was shot and killed by the prisoner, with a pistol, on a Sabbath morning, in June, 1880. Ah Yan was about sixty years of age, six feet high, stooped, was raw-boned and stout looking. There is no indication in the bill of exceptions that he had any family. The prisoner is a negro man. The homicide occurred on the Richardson plantation, in Jefferson county, at a house occupied by deceased and eight other Chinamen, one of whom, Ah Yan, had a colored wife named Leah. The house, when built, was a double-house, with passage between the rooms and gallery in front; but the passage and gallery had been closed up and made into rooms for the occupants. The front yard was inclosed, and there was a gate about fifteen paces from the room occupied by Ah Yan. The prisoner lived on the plantation, in a house near that occupied by the Chinamen, and neither ate or slept at their house.

John Walker, a witness in the case, and who was, perhaps, manager on the plantation, testified that the homicide occurred at 6:30 a. m., and describes the premises. He was not present when the prisoner shot Ah Yan, but his house seems to have been near by, and, hearing the report

9—36

of the pistol, he went immediately to the house occupied by the Chinamen, and found Ah Yan lying in the gate, his feet in the yard and his head out, shot in front of his body, below the ribs, he groaning, and died within fifteen or twenty minutes. Prisoner was in the road, outside the yard fence, and the Chinamen were making demonstrations with knives and pistols, and he was defying and threatening them.

It appears that prisoner had been at Walker's house earlier in the morning, and on leaving there, was passing the house of the Chinamen, when *Ah 18,* who occupied one of the front rooms, and was standing in his door, called him, and he went into his room, and paid him some money, or they had some conversation about money prisoner owed him.

On leaving the room of Ah 18, prisoner went to the kitchen, and, to use the language of Leah Ah Yan, "got after the cook—asked him why he was so late about breakfast, and cursed." He had a pistol in his pocket. The cook shut the door on him. He then went to the door of Ah Yan's room, which seems to have been a front room in the passage, and finding him asleep, said to him, "Ain't you up yet?" Then went into the room, pistol in hand, and said, "Get up, by G—d!" Ah Yan said, "Go away. Don't bother me. I no work to-day—it is Sunday." Prisoner replied, "You don't mean to tell me to go away?" and jerked him out of bed, and he fell on his feet. He seized with both hands a large stick or pole, about six feet long, which was lying near the door, and advanced upon prisoner, who backed down the steps into the yard, and on to and out of the gate; Ah Yan continuing to advance upon him, and striking at him with the pole. The witnesses agree that he struck him twice, and that the stick was uplifted to strike when prisoner shot him. They also agree

that while prisoner was backing from the house to the gate, he had his pistol elevated, and repeatedly said to Ah Yan, when he was advancing, and striking at him, "Go away! I don't want to hurt you!" or words to that effect. He was out of the gate when he fired the pistol, and though Ah Yan's stick was at the time raised to strike, the witnesses leave it in doubt whether he was near enough to prisoner to hit him. No doubt the prisoner, after getting through the gate, might have gone off, out of the way of Ah Yan, and avoided shooting him.

Such is the substance of the evidence. It was not proved that prisoner had made any threats, or had any grudge against Ah Yan; or that they had had any previous quarrel, or that there had been any cause of quarrel or hatred between them. The record is silent as to their previous relations.

There is nothing from which we can infer that the prisoner went into the room of Ah Yan, and pulled him out of his bed, with intent to provoke an assault, and shoot him. Such inference is repelled by the conduct of prisoner in repeatedly saying to Ah Yan, when advancing upon him, and striking at him with the stick, to go away—he did not want to hurt him.

We are of the opinion that the evidence did not warrant the verdict of murder in the first degree; that looking at all of the facts most unfavorable to the prisoner, they were not sufficient to warrant a verdict for a higher grade of homicide, than murder in the second degree.

In the twelfth instruction given for the prisoner, the court below charged the jury, substantially, in the language of Justice SCOTT, in *Bivens v. The State, 11 Ark., 461,* "That before the defendant could be convicted of murder in the first degree, it must appear, from the testimony, that the premeditation to kill existed as a cause deliberately

fixed upon before the act of killing, and was not formed by provocation received at the time of the act, or so recently before as not to afford time for reflection."

The same rule of law was approved and applied by this court in *Sweeney v. The State, 35 Ark., 485,* and a verdict for murder in the first degree affirmed; but in that case there was some evidence of a former grudge on the part of the prisoner, and no provocation on the part of the person slain, at the time the mortal blow was given with the knife, was shown.

Counsel for appellant complains that the sixth instruction moved for the state, and given by the court, was, in the haste of its preparation, inaccurately copied from *McAdam v. The State, 25 Ark., 408.*

The instruction, correctly copied, is as follows: "That in the sudden killing of a human being with a deadly weapon, without provocation, the law implies malice; and to make the killing murder, it is not necessary that any particular animosity towards the deceased should exist; but a corrupt and wicked motive and intention to do evil, which results in the death of deceased, is sufficient. Nor is it necessary that the intention to kill should have been formed or existed for any long length of time. If the intention to kill was formed or existed at the instant of the killing, it is sufficient."

It will be seen by looking at the remarks of the judge, who delivered the opinion of the court from which this instruction is copied, that it was regarded as applying to murder in the second degree, and not in the first degree, and in that view it was approved in *Sweeney v. The State, supra,* where the elements of murder in the first degree were indicated. It expresses some of the elements of murder in the first degree, as defined by the statute, which was

construed in the leading case of *Bivens v. The State*, but not all of them.

The court below also instructed the jury, on behalf of the state, that "if they believed, from the evidence, that the defendant, at the time he fired the pistol, intended to kill Ah Yan, the deceased, and did kill him, without any provocation, they will find him guilty of murder in the first degree.

A similar instruction was approved in *McAdams v. The State*, and also on the facts in *Sweeney v. The State*. No provocation appearing in that case, a like instruction was approved.

But in this case there was provocation, and the instruction was not applicable to the facts of the case.

It is not like the case in *6 Randolph, 721*, where the accused, on coming in view of the deceased, formed the design to kill him, and walked up with a quick step and killed him, without provocation, and under a statute like ours. It was held murder in the first degree.

Nor is it like the case put by Justice SCOTT, in *Bivens v. The State*, where a man is seen to raise a gun, take aim, and fire, and kill another, no provocation or mitigating circumstances being made to appear.

Nor like any of the cases of deliberate killing, with a deadly weapon, put by Mr. WHARTON, in his work on *Criminal Law, Vol. II, sec. 1113, 6th ed.*

It is difficult to define, with precision, the difference between murder in the first and second degrees, under the statute, so as to make the definition a rule in all cases; nor do we deem it necessary in this case to attempt it. The courts have generally deemed it better to decide upon the particular facts and circumstances of each case, than to attempt general definitions; and a doubt as to the degree

*Margin notes:*

1. MURDER: First and second degrees. Provocation. Instruction.

2. ———: Doubt as to degree to be resolved for defendant.

of murder, upon the facts of a case, should be resolved, upon a humane principle, in favor of the accused.

It is sufficient to say in this case, as above indicated, that the facts in evidence do not make a case of that willful, deliberate and premeditated killing which is murder in the first degree under the statute ; that the provocation under which the prisoner acted when he shot Ah Yan, reduced the killing to a lower grade of homicide.

It is true he acted unlawfully in carrying a pistol, and in trespassing into the room of the deceased, and rudely pulling him out of bed, thereby provoking an assault upon himself; but he retreated from the blows of the stick of the deceased into the yard and out of the gate, repeatedly warning him to go away—that he did not wish to hurt him ; thereby indicating that it was not his intention when he went into the room to provoke an assault and slay the deceased.    If there was any evidence upon which we could found a belief that such was his intention, we should unhesitatingly affirm the judgment.

Reversed, and remanded for a new trial.